**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-2013-WJM-KLM

C. VANCE HENDRICKSON, D.M.D.,

      Plaintiff,

v.

THOMAS DOYLE,

      Defendant.

---

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

In this action, Plaintiff C. Vance Hendrickson ("Hendrickson") sues Defendant Thomas Doyle ("Doyle") for damages Hendrickson allegedly incurred as a result of Doyle's collision with Hendrickson while skiing. (ECF No. 1.) Currently before the court is Hendrickson's Motion for Partial Summary Judgment ("Motion"). (ECF No. 35.) For the reasons explained below, the Motion is denied.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for

the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  STATE OF THE RECORD

Hendrickson's counsel, James Gigax, filed the Motion at 10:11 p.m. on June 30, 2015 (the dispositive motion deadline, *see* ECF No. 21 at 6), followed that night by four additional filings attaching exhibits, followed by three more filings the next afternoon attaching more exhibits.  (*See* CM/ECF display receipts for ECF Nos. 35–42.)  The haphazard way in which Mr. Gigax went about filing the Motion and exhibits carries over into the exhibits themselves, which have little discernible organization.  It is difficult, for example, to find certain exhibits because they are cited descriptively (*e.g.*, by the name of the deponent) rather than through a numerical or alphabetical designation.

Furthermore, Hendrickson's exhibits include numerous unauthenticated photographs, video stills, screenshots, and Internet materials.  (*See, e.g.*, ECF Nos. 36-1 through 36-12, 40-2 through 40-5.)  Doyle's Response properly called out the lack of authentication.  (*See* ECF No. 44 at 15–17.)  Mr. Gigax attempted to rectify this deficiency through the Reply, attaching various affidavits from those who allegedly

2

possess the proper authenticating knowledge.  (*See, e.g.*, ECF Nos. 47-1, 47-2, 47-3, 47-9.)[1]

Mr. Gigax evidently put little thought into preparing a proper summary judgment motion.  Although the Court could forgive an isolated oversight corrected through a Reply brief (*e.g.*, explicable failure to submit the proper authentication for one or two exhibits), the record demonstrates that Mr. Gigax did not even try to get it right the first time.  Such carelessness is unacceptable, and, as a consequence, the Court will not consider the authentication affidavits submitted with the Reply.

This should not be construed as a ruling that these exhibits are not admissible at trial.  The Court makes no ruling in that respect one way or the other.  Nonetheless, Mr. Gigax must be aware of the difficulties he may face if he persists in offering some of these exhibits, particularly those he generated himself.  For example, rather than hire a professional videographer for certain depositions, Mr. Gigax brought his own video camera and has submitted excerpts and stills from those videos.  The Court will not now address whether such videos are admissible in addition to the official deposition transcript because a potentially larger problem looms.  Specifically, someone will need to authenticate those videos, and that someone might have to be Mr. Gigax himself, thus making him a witness in his client's case.  (*See* ECF No. 47-9 (Mr. Gigax's untimely affidavit attempting to authenticate the deposition videos).)  Mr. Gigax must keep this in mind going forward.

---

[1] The Reply and its exhibits, similar to the Motion and its exhibits, spills over multiple docket entries and multiple days.  (*See* ECF Nos. 47, 48, 51, 52, 53.)

### III.  FACTS

The following facts are undisputed unless otherwise noted.

Hendrickson is a dentist by profession, and lives and works in Tennessee.  (ECF No. 1 ¶¶ 1, 37.)  He is in his mid-60s.  (ECF No. 35 at 2, ¶ 8.)  Doyle is a Colorado native in his early 20s.  (*Id.* at 1, ¶ 1.)  He grew up in Aspen and learned to ski there.  (*Id.* ¶ 2.)  He is now "a highly experienced and technically skilled skier."  (*Id.* at 2, ¶ 6.)  Both Hendrickson and Doyle were skiing at the Aspen Snowmass ski area on January 10, 2014.  (*Id.* ¶¶ 7–8.)

One of the runs both men chose to ski that day was the Green Cabin ski trail.  (*Id.* at 2–3, ¶¶ 11–12.)  About halfway down the lower portion of the Green Cabin trail, a service road known as Thornton Road cuts laterally across the slope.  (*Id.* at 3, ¶ 14; ECF No. 44 at 3, ¶ 14; *id.* at 11, ¶ 3.)  The slope flattens out somewhat at that point and then immediately resumes a typical downward pitch.  (*Id.*)  Thus, with sufficient speed, someone skiing the Green Cabin trail from above Thornton Road could use the road as a launching point for a jump.  That is what Doyle intended to do on this day.[2]

As Doyle approached Thornton Road, he noticed a class of ski students going "over the roll" (*i.e.*, the road's downhill edge), so he maneuvered to the left of them.  (ECF No. 35 at 4, ¶¶ 19, 23.)  At this point, the parties' stories diverge, but Hendrickson is willing to admit Doyle's version of events for purposes of summary judgment.  (*See* ECF No. 47 at 3–4.)  According to Doyle, therefore, he approached Thornton Road "at a normal speed and . . . in complete control of his movements."  (ECF No. 44 at 12,

---

[2] The parties dispute whether this portion of the Green Cabin trail was designated for slow skiing.  The Court does not find this dispute material to resolving the Motion.

¶ 7.)  "[B]ecause no one had skied over the roller in the seconds before [Doyle's approach], [he] believed that the area on the other side [of the] roller would be free of skiers."  (*Id.* ¶ 8.)  Thus, as he went over the roller, he launched into a "360 maneuver" which he characterized as a simple jump that took him no more than three feet off the ground for about one second, traveling about ten feet in the air.  (*Id.* at 12–13, ¶¶ 9–10, 14–16.)  Doyle "had performed the maneuver hundreds of times since he first learned to ski as a child," and "had previously performed the same maneuver in [the same] location without incident."  (*Id.* at 12, ¶¶ 11, 13.)  Unfortunately, "Doyle had not even completed a full rotation [*i.e.*, he was still in the air] when he first noticed Mr. Hendrickson."  (*Id.* at 13, ¶ 17.)  "As Mr. Doyle's skis touched the ground, he collided with Mr. Hendrickson."  (*Id.* ¶ 20.)

## IV.  ANALYSIS

Hendrickson has sued Doyle for negligence.  (ECF No. 1 ¶¶ 23–33.) Hendrickson now moves for partial summary judgment in his favor as to Doyle's "negligence and liability," and as to Doyle's affirmative defenses of comparative negligence and assumption of the risk.  (ECF No. 35 at 1.)  The Court will discuss each topic in turn.

### A.    Duty and Breach

Hendrickson says he is moving for partial summary judgment as to "negligence and liability."  (*Id.*)  This would seem to encompass everything but the actual measure of damages.  However, Doyle's Response challenges whether Hendrickson's claimed injuries in fact resulted from the collision with Doyle.  (ECF No. 44 at 19–20.)

5

Hendrickson's Reply is silent about this argument.  (*See generally* ECF No. 47.)  Thus,

it appears that Hendrickson is moving for summary judgment solely on the duty and

breach elements of a negligence claim.  *See Casebolt v. Cowan*, 829 P.2d 352, 356

(Colo. 1992) ("The elements of a claim of negligence consist of the following: a duty

owed by the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a

proximate cause relationship between the breach and the injury.").

      1.   <u>Rebuttable Presumption of Negligence Under the Ski Safety Act</u>

Colorado's Ski Safety Act ("Act") establishes the "statutory duties of a skier, the

breach of which constitutes negligence." *Pizza v. Wolf Creek Ski Dev. Corp.*, 711 P.2d

671, 680 (Colo. 1985).[3]  In this case, the Act assigns to Doyle, as the uphill skier, the

"primary duty" to avoid a collision:

> Each skier has the duty to maintain control of his speed and
> course at all times when skiing and to maintain a proper
> lookout so as to be able to avoid other skiers and objects.
> However, the primary duty shall be on the person skiing
> downhill to avoid collision with any person or objects below
> him.

Colo. Rev. Stat. § 33-44-109(2).[4]  Doyle states that the Act therefore "gives rise to a

presumption that the uphill skier was negligent" when there is "a collision between an[]

uphill skier and a downhill skier."  (ECF No. 44 at 18.)  Doyle argues, however, that "the

---

[3] Hendrickson also asserts a common law negligence claim, but he does not clearly explain how the duties under the common law might differ from the duties the Act establishes. Moreover, "[i]nsofar as any provision of law or statute is inconsistent with the provisions of [the Act], [the Act] controls."  Colo. Rev. Stat. § 33-44-114.  The Act thus has "primary control over litigation arising from skiing accidents."  *Stamp v. Vail Corp.*, 172 P.3d 437, 444 (Colo. 2007).

[4] Unless otherwise noted, all citations to the Colorado Revised Statutes are to the current version.

Colorado Supreme Court has made clear that the presumption is rebuttable." (*Id.*)

Doyle does not directly cite a Colorado Supreme Court case for this proposition, but rather a Tenth Circuit case which in turn cites the Colorado Supreme Court. The Tenth Circuit case is *Ulissey v. Shvartsman*, 61 F.3d 805 (10th Cir. 1995), which, like this case, involved a skier-on-skier collision. *See id.* at 806. "[U]nder Colorado law," says *Ulissey*, "there is a rebuttable presumption that a skier who collides with another skier is negligent." *Id.* at 809. In support, *Ulissey* cites page 679 of the Colorado Supreme Court's *Pizza v. Wolf Creek* decision, *supra*. But *Pizza*, on page 679 and throughout, is *not* addressing skier-on-skier collisions. *Pizza* instead centers around ski resort liability for injuries allegedly caused by slope conditions.

The plaintiff in *Pizza* (whose last name was, indeed, "Pizza") had been injured when "he unexpectedly became airborne due to a variation in terrain" on a particular run at Wolf Creek in 1980. *Pizza*, 711 P.2d at 674. He sued Wolf Creek "alleging negligent failure to warn of [the] dangerous condition." *Id.* The jury ruled against him, however, based on § 33-44-109(2) of the Act. *Id.* at 674–75. That is the same section quoted above establishing the duty of uphill skiers to downhill skiers, and, for simplicity, the Court will hereafter refer to it as Subsection (2). But, whereas Subsection (2) currently comprises two sentences, it comprised three sentences at the time of the Colorado Supreme Court's eventual decision (1985)—and it was that third sentence that generated the controversy. The sentence specifically addressed liability of ski area operators:

> It is presumed, unless shown to the contrary by a preponderance of the evidence, that the responsibility for

7

collisions by skiers with any person, natural object, or man-made structure marked in accordance with section 33-44-107(7) is solely that of the skier or skiers involved and not that of the ski area operator.

*Id.* at 675 (quoting Colo. Rev. Stat. § 33-44-109(2) (1984)).

The plaintiff argued that this presumption was unconstitutional for various reasons. *Id.* The Colorado Supreme Court disagreed. *Id.* at 675–79. On page 679 itself (the page cited by the Tenth Circuit in *Ulissey*), the Court discussed whether the presumption violated equal protection given that skiers injured on ski runs were being treated differently than individuals injured at other facilities, such as swimmers at swimming pools, golfers on golf courses, and skaters at skating rinks. The Colorado Supreme Court responded that "[t]he presumption involves neither a suspect class nor a fundamental right. Skiers as a group do not constitute a suspect class, and being free from a legislatively imposed rebuttable presumption of negligence is not a fundamental right." *Id.* at 679. This appears to be where *Ulissey* derived the statement that Colorado law contains "a rebuttable presumption that a skier who collides with another skier is negligent." *Ulissey*, 61 F.3d at 809.

The problem for *Ulissey* is that the "rebuttable presumption" to which *Pizza* referred was, again, Subsection (2)'s *third* sentence, which is the only sentence to use any derivative of the word *presume*, and the only sentence that discusses whether any presumption is rebuttable: "It is presumed, unless shown to the contrary by a preponderance of evidence, that [skiers are responsible for collisions, not] ski area operator[s]." *Pizza*, 711 P.2d at 675 (quoting Colo. Rev. Stat. § 33-44-109(2) (1984)). This third sentence has nothing to say about the duties of skiers toward each other,

8

and, in any event, it was repealed in 1990.  *See* 1990 Colo. Legis. Serv. S.B. 90-80,

§§ 5, 10 (West).  Thus, it would seem improper to rely on Subsection (2)'s now-

repealed third sentence, and its explication in *Pizza*, for the notion that Subsection (2)

contains a rebuttable presumption of negligence on the part of the uphill skier.

That said, the Colorado Supreme Court still cites *Pizza* for this proposition.  In

*People v. Hall*, 999 P.2d 207 (Colo. 2000), the Court addressed whether a particularly

violent skiing collision could justify an indictment for felony reckless manslaughter.  *Id.*

at 210–11.  Recklessness requires a "gross deviation" from the standard of care, so the

Court examined Subsection (2) to determine what light it could shed on the standard of

care:

> [T]he General Assembly imposed upon a skier the duty to
> avoid collisions with any person or object below him.  *See*
> § 33-44-109(2).  Although this statute may not form the
> basis of criminal liability, it establishes the minimum
> standard of care for uphill skiers and, for the purposes of
> civil negligence suits, creates a rebuttable presumption that
> the skier is at fault whenever he collides with skiers on the
> slope below him.  *See Pizza v. Wolf Creek Ski Dev. Corp.*,
> 711 P.2d 671, 676 (Colo. 1985).

*Id.* at 223 (footnote omitted).  *Hall* cited page 676 of *Pizza*, not page 679, but the

problem remains.  Page 676, like the rest of *Pizza*, analyzes Subsection (2)'s since-

repealed third sentence.

Thus, *Pizza* appears to have obtained the venerable status of "zombie

precedent.  A rule . . . extinguished by statutory amendment . . . continues to prowl,

repeatedly re-animated by mistaken citation and dicta."  *Crowell v. Knowles*, 483 F.

Supp. 2d 925, 931 (D. Ariz. 2007).  "[T]his court is not bound to further animate the

dead rule," *id.*, but the Court nonetheless concludes that the rule itself is correct, even if *Pizza* is not its proper source. The proper source, rather, is the text of Subsection (2) as it now stands, and certain inevitable inferences from that text.

To repeat, Subsection (2) currently reads as follows:

> Each skier has the duty to maintain control of his speed and course at all times when skiing and to maintain a proper lookout so as to be able to avoid other skiers and objects. However, the primary duty shall be on the person skiing downhill to avoid collision with any person or objects below him.

Colo. Rev. Stat. § 33-44-109(2). The first sentence establishes that all skiers have certain duties. But, with respect to those duties, the second sentence addresses the disadvantaged position of skiers lower on the hill compared to those above them. When in motion, it is always difficult—and sometimes impossible—for the downhill skier to "maintain a proper lookout" for uphill skiers. By contrast, the prudent uphill skier should already be looking downhill, if only to ensure that he or she is headed in the proper direction. Thus, Subsection (2) naturally places the "primary duty" on the uphill skier to avoid collisions with persons and objects downhill. In other words, the legislature has reasonably presumed that most collisions are the uphill skier's fault.

This presumption can be rebutted, however. Contrary to Hendrickson's contention (*see* ECF No. 35 at 20), an uphill skier's collision with a downhill skier is not negligence *per se*. Some violations of the Act are indeed negligence *per se*. *See* Colo. Rev. Stat. § 33-44-104(1) ("A violation of any requirement of [the Act] shall, to the extent such violation causes injury to any person or damage to property, constitute negligence on the part of the person violating such requirement."); *see also Stamp v.*

*Vail Corp.*, 172 P.3d 437, 443 (Colo. 2007) (citing § 33-44-104(1) for the proposition that "[a] violation of a duty or responsibility enumerated in the SSA constitutes negligence per se"). But, for at least three reasons, the fact of collision does not fit within that category.

First, "negligence per se occurs when the defendant violates a statute adopted for the public's safety and the violation proximately causes the plaintiff's injury. . . . If the statute applies to the defendant's actions, then the statute conclusively establishes the defendant's standard of care and violation of the statute is a breach of his duty." *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1166 (Colo. 2002). This necessarily entails a statute, the violation of which can be clearly established. In other words, the relevant statute needs to prescribe or proscribe some relatively discrete action. *See, e.g.*, *Lyons v. Nasby*, 770 P.2d 1250, 1257-58 (Colo. 1989) (holding that it would be negligence *per se* if injuries resulted from a bar owner's violation of a statute prohibiting serving drinks to an obviously intoxicated person), *superseded by statute as stated in Build It & They Will Drink, Inc. v. Strauch*, 253 P.3d 302, 305–06 (Colo. 2011). The Act contains such duties and obligations. For example, the Colorado Court of Appeals has endorsed negligence *per se* when a skier violates the duty to ski within his or her ability. *See Scott v. Silver Creek Ski Corp.*, 767 P.2d 806, 807 (Colo. App. 1988) (citing Colo. Rev. Stat. § 33-44-109(1)). Moreover, the Act requires skiers and snowboarders to use "a strap or other device capable of stopping the ski or snowboard should the ski or snowboard become unattached from the skier." Colo. Rev. Stat. § 33-44-109(6). Although the Court need not hold as much at this time, it would appear that a violation

of this requirement, if it resulted in injury, would be negligence *per se*.  But the Act does not prohibit collisions.  Thus, a collision, by itself, does not violate any particular portion of the Act and cannot support a claim for negligence *per se*.[5]

Second, the Act specifies one instance in which the duty of care shifts potentially to the downhill skier: "Before beginning to ski from a stationary position or before entering a ski slope or trail from the side, the skier shall have the duty of avoiding moving skiers already on the ski slope or trail."  *Id.* § 33-44-109(8).  Thus, the Act does not make uphill skiers negligent *per se*, or even presumptively liable, in all circumstances.

Third, negligence *per se* attributed to the uphill skier makes little sense.  For example, a particularly reckless skier could cut another off and then suddenly slow down, leaving the uphill skier no time to avoid the collision.  There is no indication in the Act that the fault should automatically be attributed to the uphill skier nonetheless.  That would be a strict liability regime.

For all of these reasons, the Court finds that the Act does not establish negligence *per se* when an uphill skier collides with a downhill skier.  Rather, the legislature's choice to give the uphill skier the "primary duty" to avoid collisions requires courts to presume the uphill skier's negligence unless the uphill skier rebuts that presumption.  Because the Act establishes no particular burden of proof for rebutting

---

[5] A particularly penitent skier, of course, might admit that he shirked his statutory "duty to maintain control of his speed and course at all times when skiing and to maintain a proper lookout so as to be able to avoid other skiers and objects."  *Id.* § 33-44-109(2).  That would seem to be the basis for negligence *per se*, but the "*per se*" label would also be immaterial given that such a confession would almost certainly establish traditional negligence as well.

that presumption, the Court assumes that the traditional civil burden, preponderance of the evidence, applies.[6]

Framed this way, the question for summary judgment purposes is whether Doyle has sufficient evidence from which a reasonable jury could conclude that he fulfilled his statutorily prescribed duties.  But before the Court can answer that question, it must address Doyle's argument that, under the circumstances, the Act shifted the primary duty to Hendrickson.

2.    Effect of Traversing

Doyle notes that, at the time of the collision, Hendrickson "was skiing from left to right in the area just below [Thornton Road]."  (ECF No. 44 at 13, ¶ 18.)  In other words, Hendrickson was traversing the slope rather than following its fall line.  Doyle then points to § 33-44-109(8), quoted above, which states, "Before beginning to ski from a stationary position or before entering a ski slope or trail from the side, the skier shall have the duty of avoiding moving skiers already on the ski slope or trail."  For simplicity, the Court will hereafter refer to this as "Subsection (8)."  Doyle argues that traversing is equivalent to "continuously re-entering the mountain from one side or the other," and therefore falls within Subsection (8), placing the burden on Hendrickson.  (ECF No. 44

---

[6] One could argue that, if the legislature intended to establish a presumption and a burden of proof to overcome it, it could have said so explicitly (as it did in Subsection (2)'s now-repealed third sentence).  This is a valid point.  However, if "primary duty" does not imply a presumption of negligence on the uphill skier's part, it is superfluous.  *Cf. People v. Trupp*, 51 P.3d 985, 988 (Colo. 2002) (Colorado courts should "avoid interpretations that render [statutory] language redundant or superfluous").  In other words, the Court cannot discern what legal effect "primary duty" might have other than to shift the burden to uphill skiers to prove that they were indeed maintaining proper control of their speed and course and maintaining a proper lookout—as opposed to requiring downhill skiers to prove the opposite, as would normally be the case in a negligence action.

at 21–22.)[7]

Doyle cites nothing to support his claim that traversing equates to continuously re-entering the slope for purposes of Subsection (8), and the Court is unwilling to hold as much.  It is "generally known within [this] court's territorial jurisdiction," Fed. R. Evid. 201(b)(1), that traversing is a common mode of descending the ski slope, especially for those who are older (such as Hendrickson), less experienced, or tired, or who simply find it preferable to ski at a leisurely pace.  To say that Subsection (8) shifts the primary duty of care to all of these skiers would significantly undermine Subsection (2).

At least two of the prominent decisions discussing skiers' duties under the Act involved collisions where the uphill skier was following the fall line and the downhill skier was traversing.  *See Ulissey*, 61 F.3d at 807; *Hall*, 999 P.2d at 210, 212.  These decisions do not mention Subsection (8).  In that sense, they say nothing about Doyle's argument.  On the other hand, if the legislature could have conceived of traversing as a form of re-entering the mountain subject to Subsection (8), it is difficult to see how all of the lawyers and judges involved in *Ulissey* and *Hall* could have overlooked it.

For these reasons, the Court rejects Doyle's argument that Subsection (8) placed the duty on Hendrickson to avoid a collision because he chose to traverse the slope.

3.      "Maintain a Proper Lookout"

We thus return to Doyle's duties under Subsection (2) and the question of

---

[7] Doyle offers this argument in support of his assumption-of-the-risk defense, but it is more properly considered as a question of the skier on whom the Act placed the duty to avoid a collision.

14

whether a jury could reasonably conclude that he satisfied those duties.  The duties, again, are (1) "to maintain control of his speed and course at all times when skiing," and (2) "to maintain a proper lookout so as to be able to avoid other skiers and objects." Colo. Rev. Stat. § 33-44-109(2).  As to maintaining control of speed and course, Hendrickson is willing to admit for summary judgment purposes only that Doyle "was skiing at a normal speed and was in complete control of his movements."  (ECF No. 44 at 12, ¶ 7; ECF No. 47 at 3.)  Thus, the real dispute is whether Doyle maintained a proper lookout.

An important fact to consider in this regard is Doyle's assertion that skiers "cannot easily be seen from above" when they are "in the area just below the roller [*i.e.*, the downhill edge of Thornton Road]."  (ECF No. 44 at 13, ¶ 19.)  Doyle characterizes this area as a "blind zone."  (ECF No. 43-2 ¶ 16.)  Hendrickson disputes this characterization (*see* ECF No. 47 at 4–5), but at this stage, the Court must view the facts in the light most favorable to Doyle.  *See Adler*, 144 F.3d at 670.  Doyle believes that the existence of a blind zone is more favorable to him and the Court will accept it as such for present purposes.

Doyle's argument appears to be that an uphill skier discharges his or her duty to maintain a proper lookout before jumping into a blind zone if the uphill skier observes the area around the blind zone for long enough and sees no one entering or exiting it. (*See* ECF No. 44 at 12, ¶ 8 ("Because the ski trail was clear, and because no one had skied over the roller in the seconds before Mr. Doyle and his friends [did so], Mr. Doyle believed that the area on the other side [of the] roller would be free of skiers."); *see also*

*id.* at 19 (arguing that a jury could find a lack of negligence based on this assertion).) Common sense supports this theory, at least in part.  Reasonable persons should know that blind zones can be dangerous, and so a skier can reasonably assume that another skier would not intentionally loiter in an obvious blind zone.  *Cf. Lord v. Erfling*, 2007 WL 2935814, at *2–3 (D. Colo. Oct. 5, 2007) (defendant in ski accident case contended that plaintiff was at least partially at fault because he stopped to fix his binding just under a headwall).  Given that, a person observing the area around the blind zone long enough and seeing no one enter or exit it could reasonably assume that no one is intentionally in the blind zone.

Even so, the Court cannot confidently predict that a Colorado court would hold that a sufficiently long observation of the area around the blind zone discharges a skier's duty under Subsection (2).  The problem is not the various factors that would be involved, *e.g.*, the obviousness of the blind zone, its size, the amount of time necessary before one can reasonably assume that no one is there, etc.  Those are questions that would be unique to each case and could be weighed by a jury.  The problem, instead, is that skiers frequently fall down and injure themselves.  Even if an uphill skier observed the area around the blind zone for several minutes, he or she could not be certain that an incapacitated skier was not lying there, unable to move to a safer location.  That is not this case, of course, but it illustrates at least one reason why the Court will not predict that a Colorado court would endorse Doyle's theory.

It may be more reasonable to predict that Colorado courts would hold that jumping into a blind zone is negligent as a matter of law absent a spotter who pre-approves the jump.  Or a narrower holding may be appropriate.  For example, Doyle

admits that, at the time he launched his 360 maneuver, his head "was not looking down the mountain" because his wind-up into the 360 requires otherwise.  (ECF No. 43-1 at 8.)  In other words, precisely at the launch point, where the blind zone would begin coming into view, Doyle turned his head—thus depriving himself of one last opportunity to abort or alter his jump in light of what he saw below.  Given these specific circumstances, perhaps no reasonable jury could conclude that Doyle satisfied his duty "to maintain a proper lookout so as to be able to avoid other skiers and objects."  Colo. Rev. Stat. § 33-44-109(2).

For two reasons, the Court declines to reach either of these holdings.  First, they would have essentially no effect on the trial.  All or nearly all of the evidence regarding duty and breach would still need to come in at least on the question of causation because Hendrickson and Doyle have very different stories about the way in which they collided.  Hendrickson claims that Doyle's skis struck him in the head and shoulder at high speed, leading to numerous specific medical problems in his head, neck, and shoulders.  (*See* ECF No. 1 ¶¶ 35–36; ECF No. 35 at 5–6, ¶¶ 31–34; ECF No. 43-20 at 1–2.)  Doyle claims that his 360 maneuver was relatively low speed and took him no more than three feet off the ground, and that he collided with Hendrickson just upon landing, not while airborne.  (ECF No. 44 at 5, ¶¶ 28, 31.)  To resolve this dispute, which in turn would inform the question of whether the collision likely caused Hendrickson's claimed injuries, the jury would still need to hear nearly everything about the terrain, the relative position of the parties and witnesses, the mechanics of the jump, and so forth.  Thus, summary judgment on duty and breach would likely remove nothing from the trial except an argument from Doyle that he observed the area around

17

the blind zone for an amount of time sufficient to make a safe jump.

Perhaps after hearing all of the evidence, the Court will indeed conclude in a Rule 50 context that such an argument cannot go to the jury, or that Doyle's choice to look away as he launched his jump was negligent as a matter of law.  But this raises the second reason not to grant summary judgment: Mr. Gigax's carelessness with respect to the Motion leaves this Court far from certain that it has received all of the argument and evidence necessary to reach any such holding at this stage.  Summary judgment for Hendrickson is therefore denied as to Doyle's duty and breach of that duty.

**B.     Comparative Negligence & Assumption of the Risk**

Colorado's comparative negligence statute requires the trier of fact to determine the amount of negligence, if any, attributable to the plaintiff, and the overall damages award must be reduced by that percentage (unless the plaintiff was equally or more negligent than the defendant, in which case the plaintiff receives nothing).  *See* Colo. Rev. Stat. § 13-21-111.  Hendrickson argues that Doyle has no evidence from which a reasonable jury could apportion any fault to Hendrickson.  (ECF No. 35 at 25–27.) Hendrickson similarly challenges Doyle's assumption-of-the-risk defense.  (*Id.* at 25.)

Hendrickson and Doyle both analyze comparative negligence and assumption of the risk as separate issues, but Colorado no longer treats them separately.  By statute, "[a]ssumption of a risk by a person shall be considered by the trier of fact in apportioning negligence pursuant to section 13-21-111."  Colo. Rev. Stat. § 13-21-111.7.  Assumption of the risk is, in other words, simply another matter to consider in the comparative negligence analysis.  *See Harris v. The Ark*, 810 P.2d 226,

233 (Colo. 1991).   Nonetheless, the application of assumption of the risk in ski accident cases is somewhat uncertain.

Colorado defines assumption of the risk as "voluntarily or unreasonably expos[ing] [oneself] to injury or damage with knowledge or appreciation of the danger and risk involved."  Colo. Rev. Stat. § 13-21-111.7.  Notably, however, the Act declares that "the risk of a [skier-on-skier] collision is neither an inherent risk nor a risk assumed by a skier in an action by one skier against another."  *Id.* § 33-44-109(1).  Hendrickson accordingly argues that assumption of the risk is simply not available as a consideration in a skier-on-skier collision lawsuit.  (ECF No. 35 at 25.)

The Court understands the Act to establish that the choice to ski, by itself, does not bring with it an assumed risk of collision with other skiers.  The Court is unwilling to hold, however, that a skier is insulated from an assumption-of-the-risk defense where that skier knowingly and voluntarily exposes him- or herself to a heightened risk of collision beyond what skiing normally entails.  *See* Colo. Rev. Stat. § 13-21-111.7.  Given the Act's emphasis on the uphill skier's duty, the list of such risks is probably small.  But, as already discussed, intentionally loitering in a blind zone would seem to be on the list.

That is Doyle's case against Hendrickson.  He argues that Hendrickson chose to traverse the mountain in a manner that ensured he would stay in the blind zone for an unreasonable amount of time.  (ECF No. 44 at 21.)  As the record currently stands, the Court finds that there is sufficient evidence from which a reasonable jury could agree and apportion some amount of fault to Hendrickson.  Thus, Doyle may go forward with his assumption-of-the-risk defense.  *Cf. Lord*, 2007 WL 2935814, at *2–3.

19

This holding effectively disposes of Hendrickson's attack on comparative negligence.  As noted, assumption of the risk is a species of comparative negligence. In practice, the distinction between assumption of the risk specifically and comparative negligence generally is a distinction between, on the one hand, "risks which were in fact known to the plaintiff, or so obvious that he must be taken to have known of them" (assumption of the risk), and on the other hand, "risks which he merely might have discovered by the exercise of ordinary care" (simple negligence).  *Harris*, 810 P.2d at 232.  A reasonable jury could conclude on Doyle's evidence that Hendrickson could have discovered the risk he was facing through ordinary care, assuming he did not already understand it.  Thus, summary judgment is not appropriate on Doyle's general comparative negligence defense.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Hendrickson's Motion for Partial Summary Judgment (ECF No. 35) is DENIED; and

2. This matter REMAINS SET for a 5-day jury trial beginning on May 23, 2016, with a Final Trial Preparation Conference on May 17, 2016, at 2:00 p.m. in Courtroom A801.

Dated this 11th day of December, 2015.

BY THE COURT:

William J. Martinez
United States District Judge